# EXHIBIT A

September 19, 2013

BY ELECTRONIC MAIL

Mr. Jeffrey T. Carr
3421 Deer Ridge Dr.
Danville, CA 94506

Re: Letter of Employment

Dear Jeff:

Authoria, Inc., d/b/a Peoplefluent (the "Company") is pleased to offer you the position of President and Chief Executive Officer of Peoplefluent Holdings Corp. ("PHC"). Your employment with the Company will commence on September 23, 2013. This letter outlines the terms and conditions of your employment with the Company and shall serve as your employment agreement with the Company (the "Agreement").

You shall serve faithfully and to the best of your ability and shall throughout the term of your employment exclusively devote your full time and attention to the business and affairs of the Company and use your best efforts to advance that business and diligently perform such duties as assigned from time to time by the Chairman of the Board of Directors of PHC (the "PHC Board"), to whom you will report. Notwithstanding the foregoing, you shall be permitted to continue the activities set forth on Exhibit A attached hereto, so long as you cease any such activity in the event the PHC Board determines the activity is materially interfering with your duties to the Company. Following the start of your employment you will be appointed as a member of the PHC Board. You agree to perform your duties primarily in the Company's Waltham, Massachusetts, office, it being agreed that you will travel to, and otherwise meet, with other team members in other Company locations and with prospects, customers and partners as required to perform your duties. You agree and acknowledge that you will not devote any of your time to any other business except as set forth in Exhibit A or as approved in advance by the PHC Board. The KZO Innovations business will not be included in your reporting structure; however, the KZO technology shall be made available for use by the Company on market terms.

It is understood that your employment is "at will." This means you are not being offered employment for a definite period of time and that either you or the Company may terminate the employment relationship at any time and for any reason, or no reason, without prior notice and without additional compensation to you, subject to the terms set forth below.

### Terms and Conditions of Employment

1. **Annual Salary Rate:** $500,000, less applicable withholding taxes, which will be paid in accordance with the Company's then current payroll policies. Your base salary shall be subject to annual review by the PHC Board.

2. **Incentive Compensation:** You will be eligible to participate in the Company's Annual Incentive Compensation Plan (the "Plan") with an annual potential variable incentive target of $400,000 at 100% Plan achievement (the "Bonus"), which target amount shall be subject to annual review by the PHC Board. Your Bonus for the fiscal year ending December 31, 2013 shall be pro-rated based on your start date, and you shall be guaranteed Bonus payments in the amount of at least $100,000 for each of Q4 2013 and Q1 2014, subject to your continued employment with the Company as required to receive payments under the Plan in accordance with the Company's standard practices. Subject to the foregoing relating to the guaranteed Bonus amount, payment of the Bonus for any particular fiscal year will be based upon your achieving certain performance criteria and the Company achieving specific financial goals, which such performance criteria and financial goals shall be established by the PHC Board in consultation with you. The performance criteria and financial goals may include, but shall not be limited to, (i) achieving revenue and bookings growth targets; (ii) significantly enhancing the Company's brand in the market and improving sales and marketing effectiveness; (iii) achieving EBITDA and cash flow targets; and (iv) ensuring enterprise-wide operating metrics are implemented, measured and achieved throughout the Company. The performance criteria and financial goals for the fiscal year ending December 31, 2013 will be based on your start date. In accordance with the Company's standard practices, you will not be entitled to the Bonus for any fiscal year unless you remain employed through January 1 of the year following the applicable fiscal year (meaning, to receive the Bonus for 2013, you must remain employed through January 1, 2014). The Bonus for each fiscal year will be paid within ninety (90) days of the end of the applicable fiscal year, but the amount paid shall be subject to adjustment (increase or decrease/repayment) as soon as reasonably practicable following completion of the financial audit for the fiscal year for which the Bonus has been potentially earned, but in no event after the calendar year following the calendar year in which the fiscal year for which the Bonus is to be paid ends. (You agree that other compensation due to you may be reduced to recover any decrease/repayment pursuant to the foregoing sentence.)

3. **Equity Compensation:** Subject to approval by the PHC Board, you shall receive grants of equity compensation covering 4,260,000 shares of PHC common stock, which such grants represent approximately 3% of the fully-diluted total shares issued and outstanding of PHC. Specifically, you will receive (i) a grant of stock options covering 3,260,000 shares of PHC common stock (the "Option Grant"), and (ii) a grant of 1,000,000 restricted share units (the "RSU Grant"). Except as otherwise provided herein, the terms and conditions of the Option Grant and the RSU Grant shall be in accordance with PHC's 2009 Equity Incentive Plan and PHC Board's standard terms and conditions for equity awards. The Option Grant will have a per share exercise price equal to fair market value of the covered shares on the date of grant (currently approximately $2.57 although subject to final determination by the PHC Board), and will vest based on years of service (i.e. vesting to occur over a four year period beginning with 25% on the first anniversary following the date of grant and quarterly thereafter, subject to continued employment). The RSU Grant shall vest (i) with respect to 333,333 of the units on a Change in Control (defined below) resulting in a Transaction Value (defined below) of at least $350,00,000, (ii) with respect to 500,000 of the units on a Change in Control resulting in a Transaction Value of at least $400,000,000, (iii) with respect to 750,000 of the units on a Change in Control resulting in a Transaction Value of at least $540,000,000, and (iv) with respect to all of the units on a Change in Control resulting in a Transaction Value of at least $680,000,000. (For the avoidance of doubt, the foregoing is not intended to be additive; i.e., the 500,000 units

vesting under clause (ii) includes the 333,333 units that would vest under clause (i).) In addition, the RSU Grant shall vest with respect to half of the foregoing amounts upon an underwritten initial public offering of the capital stock of PHC within two years of the commencement of your employment (such public offering within such two years, a "Qualified IPO"), subject to satisfaction of the Transaction Value hurdles (meaning, for example, the RSU Grant shall vest with respect to 250,000 of the units on a Qualified IPO if Transaction Value is at least $400,000,000).

In the event of, and subject to your continued employment through, a Change in Control, the Option Grant shall vest and become exercisable with respect to 50% of the then unvested covered shares, and the balance shall vest in full in the event of the termination of your employment without Cause (defined below) or your resignation for Good Reason (defined below) (a termination without Cause or resignation for Good Reason, referred to herein as an "Involuntary Termination") in either case within 12 months following the Change in Control.

In the event of your Involuntary Termination prior to a Change in Control and Qualified IPO, (i) the Option Grant shall fully vest; provided, however, the vesting portion of the Option Grant shall be exercisable only if a Change in Control or Qualified IPO occurs within 6 months following your Involuntary Termination (and shall expire to the extent not exercised on the 6-month anniversary of your Involuntary Termination), and (ii) the RSU Grant shall remain outstanding for 6 months and be eligible to vest upon the occurrence of a Change in Control or Qualified IPO within such 6-month period as to the vesting amounts and in accordance with the Transaction Value thresholds set forth above.

For purposes of this Agreement, "Transaction Value" means, in the case of an underwritten initial public offering, the market capitalization of PHC based on the price at which shares are sold to the public in connection with the offering and, in the case of a Change in Control, the transaction value, at the time of the Change in Control, but reflecting any deferred or contingent payments to shareholders appropriately discounted to reflect timing of payment and likelihood of payment. In any event, Transaction Value shall be determined by the PHC Board, in its sole, but reasonable, discretion.

For purposes of this Agreement, a "Change in Control" means the occurrence of any of the following events with respect to PHC: (i) any consolidation or merger with or into any other corporation, partnership, limited liability company or other entity in which the holders of capital stock of PHC immediately prior to such merger or consolidation no longer beneficially own, directly or indirectly, a majority of the outstanding capital stock or equity interest of the surviving corporation, partnership, limited liability company or other entity immediately after such merger or consolidation, (ii) the sale or transfer of the capital stock of PHC in which the holders of capital stock of PHC immediately prior to such sale or transfer no longer beneficially own, directly or indirectly, a majority of the outstanding capital stock or equity interest of PHC immediately after such sale or transfer, (iii) a sale or transfer of all or substantially all of the assets of PHC, or (iv) the license of all or substantially all of the assets of PHC where such license is substantially equivalent to a sale or transfer of all or substantially all of the assets of PHC. Notwithstanding anything to the contrary, the consummation of an underwritten initial public offering of capital stock in PHC shall not constitute a Change in Control.

4.     **Benefits:** As a regular full-time employee, you will be eligible to receive standard benefits under the Company's benefit plans, in accordance with the terms and conditions of those plans, which such plans and terms and conditions are subject to change. A description of the Company's current benefit plans has been provided herewith. In addition, you shall be covered by the Company's standard D&O liability insurance policies.

5.     **Vacation:** You will be entitled to accrue vacation in accordance with the Company's standard vacation policies; provided, however, that you shall accrue vacation at a rate of not less than four (4) weeks per year

6.     **Additional Compensation:** In the event that your former employer, Saba Software ("Saba"), fails to make payments to you alleging your employment with the Company is a violation of the non-competition provision of any separation agreement you have entered into with Saba (a "Saba Agreement"), the Company shall pay to you up to $100,000 of such unpaid amounts (the "Make-Whole Payment"). The Make-Whole Payment shall be payable in a lump sum following written notice by you to the Company of Saba's failure to make any such payments. Except for the foregoing, the Company shall have no obligations of any kind with respect to any dispute between you and Saba.

7.     **Relocation:** The Company will reimburse you for the reasonable relocation expenses of you and your family (in accordance with the Company's relocation policy) of up to $150,000 (which amount includes a gross-up for taxes) incurred in connection with your move from San Francisco, California to Boston, Massachusetts, provided that such relocation occurs on or before August 31, 2014. All reimbursed relocation expenses shall be subject to immediate repayment by you if you voluntarily resign other than for Good Reason or if your employment is terminated by the Company for Cause within the first two (2) years of your employment (a "Repayment Event") as follows: the percentage of reimbursed relocation expenses subject to repayment shall be 100% but shall be reduced by $1/12^{th}$ for each full month that has elapsed as of the Repayment Event since the first anniversary of the commencement of your employment. (In no event will the percentage exceed 100% or be less than 0%. For the avoidance of doubt, the amount subject to repayment decreases monthly over the second year of your employment.)

8.     **Resignation Other Than for Good Reason:** If you wish to resign for any reason (other than for Good Reason within the first twelve (12) months following a Change in Control) you agree to provide the Company with at least sixty (60) days prior written notice. The Company may elect to require you to remain in its employment for all or any part of the 60-day notice period (the "Notice Period"), or may require that you resign immediately or at any time prior to the expiration of the Notice Period. During the Notice Period, the Company may require that you do not (i) enter the offices of the Company; (ii) contact or have any communication with any prospect, customer or client of the Company; (iii) contact or have any communication with any employee, officer, director, agent or consultant of the Company; or (iv) commence any communication relating to employment or consulting with any other company. The Company shall pay you all unpaid salary and accrued but unused vacation time owing to you through the end of the Notice Period unless Cause occurs during the Notice Period. You will have no entitlement to pay or benefits beyond that date of termination.

9.     **Termination for Cause:** If you have engaged in any conduct constituting Cause, the Company may terminate your employment by providing you with written notice of termination and your employment and your rights under this Agreement shall terminate effective on the day the notice is delivered to you. Upon termination for Cause, you shall be paid all unpaid salary and accrued but unused vacation time owing to you. You will have no entitlement to pay or benefits beyond the date of termination for Cause and you shall forfeit all of your stock options and restricted stock units (whether vested or unvested).

As used in this Agreement, the term "Cause" shall mean, as determined in the good faith discretion of the Company, (a) your failure to substantially perform your duties with the Company or to follow any lawful directive or instruction of the PHC Board that continues for more than thirty (30) days after a written demand for substantial performance is delivered to you by the Company, (b) your breach of any of your fiduciary, legal or material contractual obligations to the Company, (c) your engaging in gross negligence, willful misconduct, willful violation of any law, fraud, embezzlement, material acts of dishonesty or a conflict of interest relating to the affairs of the Company or any of its affiliates, or (d) your being convicted of, or pleading nolo contendere to, any felony or to any criminal charge involving moral turpitude or that could reasonably be expected to have a material adverse effect on the business or affairs of the Company or (e) your material failure to comply with the Company's Grant of Authority Policy, including but not limited taking actions that are inconsistent with the Company's Board approved budget, or any other material Company policy.

10.    **Termination Due to Death or Disability:** In the event of your death, or the termination of your employment due to Disability, your employment and your rights under this Agreement shall terminate, you shall be paid all unpaid salary and accrued but unused vacation time owing to you, and you shall be entitled to benefits as set forth in the applicable Company benefit plan(s) (i.e., life insurance and long-term disability).

For purposes of this Agreement, "Disability" means a disability that entitles you to benefits under the Company's long-term disability plan.

11.    **Termination Without Cause or Resignation for Good Reason:** If (a) your employment is terminated by the Company without Cause, or (b) you resign for Good Reason, then, subject to your execution and non-revocation of a general release of claims satisfactory to the Company following the termination of your employment, and such release becoming irrevocable effective within sixty (60) days following the termination of your employment, you shall be entitled to receive (i) an amount equal to your base salary for the calendar month preceding the date of termination (ignoring, for these purposes, any reduction in base salary that may triggered your right to resign for Good Reason) multiplied by twelve (12) (twelve (12), referred to below as the "Severance Multiplier"), in the form of salary continuation paid in accordance with the Company's regular payroll schedule, less required withholdings (the "Separation Payments"), commencing within 60 days following your date of termination (provided that, if such 60-day period spans two calendar years, the payments shall in any event begin in the second such calendar year, and further provided that once such payments commence, the first payment will include any unpaid amounts accrued from the date of termination), (ii) Health Benefits Contributions (as defined below), (iii) a 6-month post-termination exercise period for the Option Grant and (iv) in the event the termination occurs in

the final quarter of a fiscal year, a pro-rated bonus, to the extent actually earned, paid on June 30 of the following year; provided that you (y) continue to cooperate as reasonably requested with reasonable transitional matters; and (z) continue to fully abide by all Post Separation Obligations (as defined below). You will be paid or reimbursed, as the case may be, for all unpaid salary, reasonable and approved business expenses, benefits and other amounts payable to you or earned by you up to the date of termination. Notwithstanding anything herein to the contrary, (a) in the event your employment is terminated by the Company without Cause or you resign for Good Reason and (b) (i) if your termination occurs prior to August 31, 2014, and you have not yet relocated to the Boston, Massachusetts, area or (ii) if your termination occurs on or after August 31, 2014, and you have not relocated to the Boston, Massachusetts, on or prior to August 31, 2014, then the Severance Multiplier shall be three (3) instead of twelve (12).

As used in this Agreement, "Health Benefits Continuation" shall mean the continuation of coverage for you (and your dependents, if applicable), under the group medical and dental plans in which you (and your dependents, if applicable) are enrolled as of your date of termination until the earlier of (1) the end of the calendar month that includes payment of the last installment of the Separation Payments, and (2) the first day of the calendar month coinciding with or next following the calendar month in which you are first eligible to enroll in another employer's group health plan. Your right to Health Benefits Continuation will be subject to (a) your making a timely election for group health plan continuation coverage under COBRA such that the period of Health Benefits Continuation shall run concurrently (not consecutively) with any available period of continuation coverage under COBRA, and (b) your continuing authorization of the deduction from the Separation Payments of an amount equal to the amount of premiums that must be paid by actively-employed senior executives of the Company to maintain the same group health plan coverage that is provided to you following your termination of employment.

Notwithstanding anything contained in the immediately preceding paragraph to the contrary, if the Company determines in its sole discretion that it cannot provide all or any portion of the Health Benefits Continuation without potentially violating, or being subject to an excise tax under, applicable law (including, without limitation, Section 2716 of the Patient Protection and Affordable Care Act), or the terms of the applicable insurance policy, the Company shall in lieu of providing the Health Benefits Continuation pay to you, on a grossed-up basis, a monthly payment in an amount equal to the Company's share of your monthly premium for group medical and dental coverage in effect on your date of termination for the remainder of the Health Benefits Continuation period described above (which amount shall be based on the premium for the first month of such coverage) (the "Taxable Payments"). Such Taxable Payments shall be paid on the first regular payroll date of each applicable month for the remainder of the Health Benefits Continuation period. For the avoidance of doubt, the Taxable Payments may be used by you for any purpose, including but not limited to continuation coverage under COBRA.

As used in this Agreement, "Good Reason" shall mean that you have complied with the "Good Reason Process" following the occurrence of any of the following events, provided that you have not consented to such event(s): (i) a material diminution of your responsibilities, authority or duties; (ii) a material diminution of your salary except for across-the-board salary reductions based on the Company's financial performance similarly affecting all or substantially all senior officers of the Company; (iii) a material change in the geographic location at which you provide services to the Company; or (iv) a material breach of this Agreement by the Company. "Good

Reason Process" shall mean that (i) you reasonably determine in good faith that a "Good Reason" condition has occurred; (ii) you notify the Company in writing of the first occurrence of the Good Reason condition within 30 days of the first occurrence of such condition; (iii) you cooperate in good faith with the Company's efforts, for a period of not less than 30 days following such notice (the "Cure Period"), to remedy the condition; (iv) notwithstanding such efforts, the Good Reason condition continues to exist; and (v) you terminate your employment within 30 days after the end of the Cure Period.

12.     **Section 409A:** Anything in this Agreement to the contrary notwithstanding, if at the time of your separation from service within the meaning of Section 409A of the Code, the Company determines that you are a "specified employee" within the meaning of Section 409A(a)(2)(B)(i) of the Code, then to the extent any payment or benefit that you become entitled to under this Agreement on account of your separation from service would be considered deferred compensation subject to the 20 percent additional tax imposed pursuant to Section 409A(a) of the Code as a result of the application of Section 409A(a)(2)(B)(i) of the Code, such payment shall not be payable and such benefit shall not be provided until the date that is the earlier of (A) six months and one day after your separation from service, or (B) your death. If any such delayed cash payment is otherwise payable on an installment basis, the first payment shall include a catch-up payment covering amounts that would otherwise have been paid during the six-month period but for the application of this provision, and the balance of the installments shall be payable in accordance with their original schedule.

The Company and you intend that this Agreement will be administered in accordance with Section 409A of the Code. To the extent that any provision of this Agreement is ambiguous as to its compliance with Section 409A of the Code, the provision shall be read in such a manner so that all payments hereunder comply with Section 409A of the Code. The Company and you agree that this Agreement may be amended, as may be necessary to fully comply with Section 409A of the Code and all related rules and regulations in order to preserve the payments and benefits provided hereunder without additional cost to the Company or you. Each payment provided hereunder is a separate payment for purposes of Section 409A of the Code.

The determination of whether and when a separation from service has occurred shall be made in accordance with the presumptions set forth in Treasury Regulation Section 1.409A-1(h).

The Company makes no representation or warranty and shall have no liability to you or any other person or entity if any provisions of this Agreement are determined to constitute deferred compensation subject to Section 409A of the Code but do not satisfy an exemption from, or the conditions of, such Section.

13.     **Company Property:** All equipment, material, written correspondence, memoranda, communication, reports, or other documents pertaining to the business of the Company used or produced by you in connection with your employment, or in your possession or under your control, shall at all times remain the property of the Company. You shall return all such property of the Company in your possession or under your control in good condition promptly upon the request by the Company, or immediately upon termination of your employment for any reason.

14.     **Contingency:** This offer is contingent upon the Company's satisfactory results of a background check which has not yet commenced and reference checks. This offer also is conditional upon your providing satisfactory proof of eligibility for employment in the United States.

15.     **Your Obligations:**

        *(a)     Conflicts of Interest.* During your employment with the Company, you shall not: (i) engage in any outside business activity without written authorization from the Company; (ii) in any way compete with the Company or any of its affiliates; or (iii) engage in any conduct intended to or reasonably expected to harm the interests of the Company or its affiliates. Notwithstanding the foregoing, you may engage in personal investment activities and charitable work which do not interfere with your duties for the Company.

        *(b)     Agreement Not to Compete.* You covenant and agree that, commencing on your employment with the Company and continuing until 12 months following your last day of employment with the Company, you shall not, directly or indirectly, individually or as a consultant to, or an employee, officer, director, manager, stockholder, partner, member, investor, lender or other owner or participant in any business entity, anywhere in the Prohibited Territory, engage in or assist others in engaging in any business which competes with any business in which the Company is engaging or in which, to your knowledge, the Company plans to engage, during your employment or at the time of termination of your employment; provided that, if you are terminated by the Company without Cause or if you resign for Good Reason, your non-competition obligation shall be in effect for a period of six (6) months following your last day of employment with the Company or, if shorter, for a the number of months equal to the Severance Multiplier (such applicable period, the "Restricted Period"). Notwithstanding the preceding, the following shall not constitute by themselves a violation of this Section 15(b): (i) owning the stock or options to acquire stock totaling less than 5% of the outstanding shares in a public company-or (ii) being employed by a corporation that engages in any business which competes with any business in which the Company is engaging or in which, to your knowledge, the Company plans to engage, during or at the time of termination of your employment if (x) such corporation has a public market capitalization of at least $300,000,000 and (y) you are employed by a subsidiary or discrete subdivision that does not engage in any business which competes with any business in which the Company is engaging or in which, to your knowledge, the Company plans to engage, during or at the time of termination of your employment.

"Prohibited Territory" means any geographic territory and areas in which the Company engaged in business at any time during the last 12 months of your employment with the Company. You acknowledge and agree that you will assist the Company to engage in its business in all geographic areas described in the preceding sentence and therefore such territory is necessary and reasonable for the obligations in this agreement not to compete.

        *(c)     Agreement Not to Interfere with Customers.* You covenant and agree that, during the Restricted Period, you shall not, directly or indirectly, individually or as a consultant to, or an employee, officer, director, manager, stockholder, partner, member, investor, lender or other owner or participant in any business entity, (i) solicit, encourage, cause or attempt to cause any Restricted Customer (as defined below) to purchase any services or products from any

PLDOCS01/75576.7                            8

business other than the Company that are competitive with or a substitute for the services or products offered by the Company; (ii) sell or provide any services or products to any Restricted Customer that are competitive with or a substitute for the Company's services or products (whether as an employee of Restricted Customer or otherwise); (iii) solicit, encourage, cause or attempt to cause any supplier of goods or services to the Company not to do business with or to reduce any part of its business with the Company; or (iv) make any disparaging remarks about the Company or its business, services, affiliates, officers, directors or management employees, whether in writing, verbally, or otherwise, to any Restricted Customer.

"Restricted Customer" means: (i) any customer or prospective customer of the Company with whom you had contact or communications at any time during your last 12 months as a Company employee; (ii) any customer or prospective customer of the Company for whom you supervised the Company's dealings at any time during your last 12 months as a Company employee; and/or (iii) any customer or prospective customer of the Company about whom you obtained any Confidential Information (as defined below) during your last 12 months as a Company employee.

    *(d)*    *Agreement Not to Solicit Employees.* You covenant and agree that during the Restricted Period, you will not, directly or indirectly, individually or as a consultant to, or an employee, officer, director, manager, stockholder, partner, member, investor, lender or other owner or participant in any business entity: (a) hire or engage as an employee or as an independent contractor any person then-employed or engaged by the Company; (b) solicit or encourage any employee or independent contractor to leave his or her employment or engagement with the Company; and/or (c) hire or engage any person who was employed or engaged by the Company as of your last day of employment with the Company unless that person has then been separated from the Company for at least 120 days.

    *(e)*    <u>Intellectual Property</u>. You shall promptly and fully disclose all Intellectual Property (as defined below) to the Company. You hereby assign and agree in the future to assign to the Company (or as otherwise directed by the Company) your full right, title and interest in and to all Intellectual Property. You agree to provide during and after the term of this Agreement, at the Company's request and expense, all further cooperation that the Company reasonably determines is necessary or desirable to accomplish the complete transfer of the Intellectual Property and all associated rights to the Company, its successors, assigns and nominees, and to ensure the Company the full enjoyment of the Intellectual Property. You hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as your agent and attorney-in-fact (which designation and appointment shall be deemed coupled with an interest and shall survive your death or incapacity), to act for and in your behalf, solely with respect to the Intellectual Property, to execute and file any such applications, extensions or renewals and to do all other lawfully permitted acts to further the prosecution and issuance of such letters patent, other intellectual property registrations or filings or such other similar documents with the same legal force and effect as if executed by you. You hereby waive all claims to moral rights in the Intellectual Property. All copyrightable works that you create during your employment with the Company shall be considered "work made for hire" and shall, upon creation, be owned exclusively by the Company. For purposes of this Agreement, "Intellectual Property" means any invention, formula, process, discovery, development, design, innovation or improvement (whether or not patentable or registrable under copyright statutes)

PLDOCS01/75576.7        9

(each, an "Invention") made, conceived or first actually reduced to practice by you, solely or jointly with others, during your employment with the Company; provided, however, that, as used in this Agreement, the term "Intellectual Property" shall not include any Invention that you develop on your own time, without using the equipment, supplies, facilities or information of the Company, unless such Invention, at the time of conception or reduction to practice, (i) relates to: (a) the business of the Company or (b) the actual or demonstrably anticipated research or development of the Company, or (ii) directly results from any work performed by you for the Company.

(f) Confidential Information. You covenant and agree that, except to the extent the use or disclosure of any Confidential Information is required to carry out your assigned duties with the Company, during your employment with the Company and at all times thereafter: (i) you shall keep strictly confidential and not disclose to any person not employed by the Company any Confidential Information; and (ii) you shall not use for yourself or for any other person or entity any Confidential Information. However, this provision shall not preclude you from: (x) the use or disclosure of information that is or becomes generally available to the public (other than information generally available to the public as a result of your violation of this Section), or (y) any disclosure required by law or court order so long as you provide the Company immediate written notice of any potential disclosure under this subsection and fully cooperates with the Company to lawfully prevent or limit such disclosure.

"Confidential Information" means all trade secrets and all other confidential or proprietary information related in any way to the Company's business that is furnished to, obtained by, or created by you during your employment with the Company. Confidential Information includes, by way of illustration, such information relating to: (i) Company customers, including customer lists, contact information, contractual terms, billing histories, preferences, and information regarding products or services provided by the Company; (ii) the Company's finances, including financial statements, balance sheets, sales data, forecasts, and cost analyses; (iii) the Company's plans and projections for business opportunities for new or developing business, including marketing concepts and business plans; (iv) the Company's research and development activities, technical data, technologies, computer files, and software; (v) the Company's operating methods, business processes and techniques, services, products, prices, costs, service performance, and operating results; and (vi) all Intellectual Property.

(g) Return of Property. All property, documents, data, and Confidential Information prepared or collected by you as part of your employment with the Company, in whatever form, are and shall remain the property of the Company. You agree to return upon the Company's request at any time (and, in any event, before your employment with the Company ends) all documents, data, Confidential Information, and other property belonging to the Company in your possession or control, regardless of how stored or maintained and including all originals, copies and compilations.

(h) Reasonableness of Restrictions. You have carefully read and considered the provisions of this Agreement and, having done so, agree that the restrictions set forth herein are fair, reasonable, and necessary to protect the Company's legitimate business interests, including its goodwill with its customers and employees and its confidential and trade secret information. In addition, you acknowledge and agree that your abilities and skills are readily

Case 1:15-cv-13416-PBS   Document 11-1   Filed 11/17/15   Page 12 of 16
Case 1:15-cv-13416   Document 1-3   Filed 09/22/15   Page 12 of 16

useable in a variety of capacities in most geographic areas such that the foregoing restrictions do not unreasonably restrict you with respect to seeking employment elsewhere in non-competitive ventures should your employment with the Company end. Thus, you agree not to contest the general validity or enforceability of this Agreement before any court, arbitration panel or other body. Your restrictions and obligations in subsections (a) through (h) of this Section (the "Post Separation Obligations") shall survive your last day of employment with the Company and shall be in addition to any restrictions imposed upon you by statute, at common law, or other agreements. The Post Separation Obligations shall continue to be enforceable regardless of whether there is any dispute between the Parties concerning any alleged breach of this Agreement.

        *(i)*    *Breach of Restrictions.* You agree that your breach of any of the Post Separation Obligations would result in irreparable damage and continuing injury to the Company. Therefore, in the event of any breach or threatened breach of such covenants, the Company shall be entitled to an injunction from a court of competent jurisdiction enjoining you from committing any violation of those covenants, and you hereby consent to the issuance of such an injunction. You further agree that the Company shall not be required to post a bond to obtain such an injunction. In addition, except as required by law, the Company may suspend the payments set forth in Section 11 if you have breached the covenants applicable to you contained in Section 15. If, after the suspension of such payments, the Company obtains preliminary injunctive relief enjoining you from breaching any of the terms of Section 15, or a court of competent jurisdiction issues a final judgment (not subject to appeal) (which shall include any order or judgment that finally disposes of the action) that you have breached any of the terms of Section 15, then you shall promptly repay to the Company any such payments you previously received pursuant to Section 11 and the Company will have no obligation to pay any of the amounts that remain payable by the Company under Section 11. If, however, after the suspension of such payments by the Company, a court of competent jurisdiction either denies the Company's motion, request or application for preliminary injunctive relief or issues a final judgment (not subject to appeal) (which shall include any order or judgment that finally disposes of the action) that you have not breached any of the terms of Section 15, then the Company shall pay to you all remaining payments described in Section 11. All remedies available to the Company by reason of a breach by you of the provisions of this Agreement are cumulative, none is exclusive, and all remedies may be exercised concurrently or consecutively at the Company's option.

16.    **Applicable Law:** This Agreement, its interpretation, performance or any breach thereof, will be construed in accordance with, and all questions with respect thereto will be determined by, the laws of the Commonwealth of Massachusetts applicable to contracts executed and to be performed entirely therein. Any action concerning or related to this Agreement must be brought exclusively in the Commonwealth of Massachusetts. The parties irrevocably consent to the jurisdiction of the courts in Massachusetts (whether federal or state) for all such disputes and irrevocably consent to service via nationally recognized overnight carrier, without limiting other service methods allowed by applicable law.

17.    **Enforceability:** This Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision hereof shall be prohibited or invalid under any such law, such provision shall be ineffective to the extent of such prohibition or invalidity,

without invalidating or nullifying the remainder of such provision or any other provisions of this Agreement. If any one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to duration, geographical scope, activity or subject, such provisions shall be construed by limiting and reducing it so as to be enforceable to the maximum extent permitted by applicable law.

**18.   Notices:** All notices, demands or other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered in person, by e-mail or fax, by United States mail, certified or registered with return receipt requested, or by a nationally recognized overnight courier service, or otherwise actually delivered: (a) if to you: to your address in the records of the Company ; (b) if to the Company, Bedford Funding Capital Management, L.L.C., c/o Peoplefluent Holdings Corp., 10 New King Street, Suite 104, White Plains, NY, 10604-1208; attention Jonathan D. Salon, General Counsel; or (c) or at such other address as may have been furnished by such person in writing to the other parties. Any such notice, demand or communication shall be deemed given on the date given, if delivered in person, e-mailed or faxed, on the date received, if given by registered or certified mail, return receipt requested or given by overnight delivery service, or three days after the date mailed, if otherwise given by first class mail, postage prepaid.

**19.   Amendments and Waivers:** This Agreement may be amended or modified only by a written instrument signed by the Company and you. No waiver of this Agreement or any provision hereof shall be binding upon the party against whom enforcement of such waiver is sought unless it is made in writing and signed by or on behalf of such party. No delay or omission in exercising any right under this Agreement shall operate as a waiver of that or any other right.

**20.   Binding Effect:** This Agreement shall be binding on and inure to the benefit of the parties hereto and their respective heirs, executors and administrators, successors and assigns, except that your rights and obligations hereunder are personal and may not be assigned without the Company's prior written consent. This Agreement shall continue to be binding and enforceable in full notwithstanding any changes that may occur in the terms or conditions of your employment with the Company.

**21.   No Conflicting Agreements:** Other than as may be alleged by Saba, you represent and warrant to the Company that you are not a party to or bound by any confidentiality, noncompetition, non-solicitation, employment, consulting or other agreement or restriction that could conflict with, or be violated by, the performance of your duties to the Company or obligations under this Agreement. You agree not to use or misappropriate any intellectual property, trade secrets or confidential information belonging to former employers or to any other person or entity with whom you have or have had an agreement or to whom you owe a duty to keep such information in confidence.

**22.   Interpretation:** The captions of the sections of this Agreement are for convenience of reference only and in no way define, limit or affect the scope or substance of any section of this Agreement. The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises under any provision of this Agreement, this Agreement shall be construed as if drafted jointly by the parties

thereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of authoring any of the provisions of this Agreement.

**23.    Notification of New Employer:** In the event that you are no longer an employee of the Company, you consent to notification by the Company to your new employer or its agents regarding your rights and obligations under this Agreement.

**24.    Withholding:** All amounts to be paid hereunder shall be subject to applicable withholding.

**25.    Attorneys' Fees:** The Company will reimburse you for the reasonable attorneys' fees incurred by you in connection with your review and negotiation of this Agreement (including any term sheets which preceded this Agreement), subject to appropriate documentation of same, in an amount not to exceed $5,000.00.

**26.    Entire Agreement:** To ensure complete understanding before employment, and the best relationship during employment, we would like to point out that this letter constitutes our entire offer of employment, and that there are no promises nor conditions implied or expressed that are not contained within this letter. We wish to further advise you that any statements in this letter do not guarantee, nor should be construed to guarantee employment, or any period of employment.

The financial terms set forth above, like any compensation related matters, are confidential and should be kept strictly confidential.

We trust that the above will be acceptable to you and ask that you indicate your acceptance by returning one original copy of this letter to me at your soonest convenience.

Jeff, I am very excited about having you join Peoplefluent and leading the business forward as we have discussed. I am confident that your enthusiasm, knowledge and skills will be a valuable addition to the Company.

If I can be of further assistance, please feel free to contact me.

Sincerely,

*[signature]*

Jonathan D. Salon
Vice President

ACCEPTED:

*[signature]*        09/19/13
Jeffrey T. Carr        Date:

# EXHIBIT A

## OTHER ACTIVITIES